# United States Court of Appeals for the Fifth Circuit

————————

No. 25-10196

————————

United States Court of Appeals
Fifth Circuit

**FILED**

July 17, 2026

Lyle W. Cayce
Clerk

Jennifer Thompson,

*Plaintiff—Appellant*,

*versus*

Acy McGehee, *individually and in his official capacity as Mayor of the City of Godley*; City of Godley, Texas; Matthew Cantrell, *individually and in his official capacity as Interim Police Chief of the Godley Police Department*; Jeremy Arbuthnot, *Badge #980*; Spencer Templer, *Badge #985*,

*Defendants—Appellees*.

————————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:23-CV-1441

————————————————————————

Before Elrod, *Chief Judge*, Richman, and Willett, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:

Jennifer Thompson was a Godley City Councilwoman and critic of Godley's Mayor and interim Police Chief. In February 2023, minutes before a city council meeting, a Godley police officer arrested her for a putative violation of Texas Penal Code § 37.10(a)(1), which makes it a misdemeanor to tamper with a government record. She sued the City of Godley (the City)

and several Godley officials under 42 U.S.C. § 1983, asserting violations of her First, Fourth, and Fourteenth Amendment rights.

The district court dismissed her Second Amended Complaint for failure to state a claim. We REVERSE the dismissal of her First, Fourth, and Fourteenth Amendment claims against Jeremy Arbuthnot and Spencer Templer, her First Amendment retaliatory arrest claim against Individual Defendants, her *Monell* claims against the City, and her fabrication claim against all defendants. Those claims are REMANDED for further proceedings. We AFFIRM the dismissal of her Fourth and Fourteenth Amendment claims against former Mayor Acy McGehee and former interim Police Chief Matthew Cantrell.

## I

In late 2022 and early 2023, municipal politics in Godley were acrimonious. Godley operates under an aldermanic form of government. The City Council consists of a mayor and five city council members. The mayor does not vote unless his vote is needed to break a tie.

In October 2022, Police Chief Jason Jordan resigned after Officer Solomon Omotoya accused him of racial discrimination. Before he resigned, Chief Jordan passed around a folder at the city council meeting with information supporting his belief that city officials—including his own officers—were violating state and federal law by targeting residents and city council members for the content of their speech. After the City Council accepted Jordan's resignation, three city council members reviewed Jordan's materials and had second thoughts. They sought to reinstate Jordan, which would have displaced Mayor Acy McGehee's replacement candidate.

These three city council members—Plaintiff-Appellant Jennifer Thompson, Michael Papenfuss, and Roger Cornelison—soon emerged as the "opposition party" to Mayor McGehee and the City's employees. Friction

ensued.  Papenfuss sought to discover whether Officer Omotoya had made untruthful statements and falsified legal documents while employed with a previous law enforcement agency; shortly thereafter, two police officers (including Omotoya) and another city employee filed sexual harassment complaints against Papenfuss.  Thompson sought information about an allegation that a retired fire truck had been transferred to a friend of the City Administrator for free rather than being sold at auction.  Thompson also questioned—*inter alia*—the City's uncontracted employment of the City Administrator's relative to service the City's police cars.  Thompson alleges that she was then summoned to the police station and that Interim Chief Cantrell, Officer Arbuthnot, and Officer Omotoya "told [her] . . . to stop publicly voicing her concerns.  They said that if she did not, there would be consequences, which implied the Department would retaliate."  Later, Mayor McGehee accused Thompson of being an outsider whose actions caused the loss of many city employees and risked changing the character of the City.

These frictions occurred prior to Thompson's arrest in connection with a city council meeting.  The Texas Open Meetings Act requires municipalities to give notice of the time, place, and subject of upcoming council meetings.[1]  The notice must be posted publicly at City Hall for at least three business days before the meeting.[2]

The City Secretary circulated a draft agenda for the upcoming city council meeting via email on Thursday, December 22, 2022.  Thompson emailed the Secretary, asking her to add items that Thompson alleged should have been carried over from the prior meeting.  The Secretary responded that

---

[1] Tex. Gov't Code § 551.041.

[2] *See id.* §§ 551.043, 551.050(b).

she did not know which items should have been carried over. Shortly thereafter, around 5:20 p.m., the Secretary circulated a final agenda that omitted the items that Thompson thought should have been added and contained the Secretary's digital signature "certifying that the agenda was posted on Thursday . . . at 6:00 p.m.," even though the email was sent 40 minutes before 6:00 p.m.

Apparently recognizing that time was of the essence to meet the Texas Open Meetings Act's three-business-day requirement, Thompson added the omitted discussion items to the agenda and returned it via email to the Secretary, instructing her to post the updated agenda rather than the originally-circulated version. When Thompson made these additions, she did not remove the Secretary's digital signature at the bottom of the document. Thompson blind copied fellow councilmember and Mayor Pro Tempore Michael Papenfuss on her return email to the Secretary, which read "Please see attached and post the updated agenda."

This—according to the City and the individual defendants—was a crime—or, at least, they asserted in a motion to dismiss that it would give a reasonable officer probable cause to believe that a crime had been committed. Thompson's alleged crime was misdemeanor tampering with a government record, a violation of Texas Penal Code § 37.10(a)(1): "A person commits an offense if he . . . knowingly makes a false entry in, or false alteration of, a governmental record[.]"[3] The theory of the crime was that Thompson had violated the statute by adding her proposed agenda items with the City Secretary's certification intact. By making her proposed alterations on a version of the document digitally signed by the City Secretary, they alleged that she had falsely altered a governmental record. Papenfuss would later

---

[3] TEX. PENAL CODE § 37.10(a)(1).

post Thompson's version of the agenda on his Facebook page, then take it down when he learned that the City Secretary had declined to certify Thompson's proposed additions.

The investigation began the following week. The Godley Police first investigated Papenfuss and Thompson for felony forgery. Officer Arbuthnot took the case to the Johnson County District Attorney but was rebuffed. Thompson alleges that "Assistant District Attorney Ryan Eady immediately recognized the frivolity of the case and informed Arbuthnot that the facts and circumstances did not give rise to forgery in part because they *negated* intent to deceive . . . . [H]e suggested that the pending [retaliation] complaints [by Thompson against the officers] created conflicts of interest that would taint any investigation and prosecution."

Officer Arbuthnot informed Interim Chief Cantrell, Mayor McGehee, City Attorney Callaway, and Officer Templer that the district attorney had rejected the felony case. Mayor McGehee and City Attorney Callaway "directed the Department to find a way to 'get it done.'" The officers then sought to charge Thompson with a misdemeanor, which would be prosecuted by the Johnson County Assistant County Attorney, rather than the District Attorney. The officers submitted the probable cause affidavit to the County Attorney on December 29. Nothing further transpired regarding the potential charges until February 7, the day of a council meeting at which Thompson planned to vote for the removal of Interim Chief Cantrell and the installation of a City Attorney of her choosing.

Around 11 a.m. on February 7, the County Attorney emailed Arbuthnot that "your warrant looks good to go." Arbuthnot presented the affidavit to a magistrate, who signed it. One of the officers erroneously entered the warrant into the system as a felony warrant, a tactic that Thompson alleges was intended to require her strip search upon booking.

Either Cantrell or Arbuthnot directed Officer Templer to arrest Thompson at her residence. Officer Templer instead arrested Thompson in the parking lot of City Hall, five and a half weeks after the putative crime and a few minutes before the city council meeting. Thompson's absence left the City Council deadlocked 2-2; Mayor McGehee used his tiebreaking authority to secure his preferred appointees for City Attorney and City Secretary. Three days later, the County Attorney declined to prosecute.

Thompson alleged that Mayor McGehee, Interim Police Chief Cantrell, and Officers Arbuthnot and Templer "with knowledge that [Thompson], Papenfuss and Cornelison would likely pass those [agenda] items [*inter alia*, securing Mayor McGehee's preferred appointees] at the February 7, 2023 meeting, agreed that the arrest should be executed in such a way that [Thompson] would be sitting in jail during the city council meeting." Thompson sued, asserting seven § 1983 claims.

Thompson alleges a First Amendment violation by the City, a retaliatory arrest First Amendment violation by the City, and a retaliatory arrest First Amendment violation by Mayor McGehee, Interim Police Chief Cantrell, and Officers Arbuthnot and Templer (Individual Defendants). She alleges a *Franks* false arrest claim under the Fourth Amendment against both the City and Individual Defendants. She alleges a Fourth and Fourteenth Amendment malicious prosecution claim against both the City and Individual Defendants. She alleged—but has now abandoned—a § 1983 conspiracy claim against both the City and Individual Defendants. Finally, she alleges a standalone § 1983 "abuse of process" claim against both the City and Individual Defendants. The district court granted the City and Individual Defendants' motions to dismiss all claims in Thompson's Second Amended Complaint.

No. 25-10196

## II

Because the viability of Thompson's *Monell* claims against the City depends on the existence of an underlying constitutional violation,[4] we begin with her claims against the Individual Defendants.  A § 1983 claim has two elements: "a violation of the Constitution or of federal law, and . . . that the violation was committed by someone acting under color of state law."[5]  It is uncontested that the Individual Defendants acted under color of state law. We focus on whether there was a constitutional violation.  We first evaluate whether Thompson has adequately pled a Fourth Amendment violation, and we then consider whether she has adequately pled a First Amendment violation.

## A

Thompson asserts a Fourth Amendment *Franks* false arrest claim. "[A]n officer who recklessly or intentionally contribute[s] misleading statements or omissions to a warrant affidavit violates the arrestee's constitutional rights."[6]  To prevail, Thompson must prove that "(1) the affiant, in support of the warrant, include[d] 'a false statement [made] knowingly and intentionally, or with reckless disregard for the truth' and

---

[4] *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997) ("Without an underlying constitutional violation, an essential element of municipal liability is missing.").

[5] *Rich v. Palko*, 920 F.3d 288, 293-94 (5th Cir. 2019) (citation omitted) (quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)).

[6] *Hughes v. Garcia*, 100 F.4th 611, 620 (5th Cir. 2024).

(2) 'the allegedly false statement is necessary to the finding of probable cause.'"[7]

*Franks* liability is assessed on a defendant-by-defendant basis. A law enforcement officer is only subject to liability if they "assisted in the preparation of, or otherwise presented or signed a warrant application."[8] An officer who does not present or sign the affidavit may be liable if "he helped prepare the complaint by providing information for use in it."[9] An officer who makes knowing and intentional or reckless omissions that result in a warrant being issued without probable cause is also subject to *Franks* liability.[10] Reckless or intentional misstatements or omissions will defeat qualified immunity.[11]

## 1

Assessing whether an allegedly false statement is "necessary to the finding of probable cause" turns on what *would* establish probable cause for a violation of the statute at issue. To assess Thompson's *Franks* claim, then, we must first interpret the Texas statute under which the warrant issued. "We apply the statutory analysis that a Texas court would apply."[12] "In Texas, the cardinal rule of statutory construction is to ascertain the

---

[7] *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

[8] *Melton v. Phillips*, 875 F.3d 256, 263 (5th Cir. 2017) (en banc).

[9] *Id.* at 264.

[10] *Id.*

[11] *See Winfrey*, 901 F.3d at 494; *see also Hughes*, 100 F.4th at 620 ("[A]n officer who recklessly or intentionally contributed misleading statements or omissions to a warrant affidavit violates the arrestee's constitutional rights. That violation has been clearly established since *Franks*.").

[12] *LaSalle Bank Nat'l Ass'n v. Sleutel*, 289 F.3d 837, 839 (5th Cir. 2002).

No. 25-10196

'legislature's intent,' and to give effect to that intent. The duty of the court is to construe a statute as written and ascertain the legislature's intent from the language of the act."[13] When a statute's language is unambiguous, we interpret it in accordance with its plain meaning, unless its plain meaning "leads to absurd results that the Legislature could not possibly have intended."[14]

"Texas Penal Code § 37.10, the 'Tampering with Governmental Record' statute, is complicated, covering a multitude of potential harms. The offense can be committed six different ways—and may involve a real 'governmental record' (itself defined six different ways) or a fake one."[15] "By enacting § 37.10, the legislature intended to prevent a multitude of harms, including the destruction of governmental records, the perpetration of a fraud upon the court, and the miscarriage of justice that could result from the use of falsified records."[16]

Officer Arbuthnot's affidavit alleged that Thompson had violated Texas Penal Code § 37.10(a)(1). "The elements for tampering with a government record under [§] 37.10(a)(1) are that (1) a person (2) knowingly made a false entry in or a false alteration of (3) a governmental record. According to its plain language, [§] 37.10(a)(1) requires the document to be

---

[13] *McNeil v. Time Ins. Co.*, 205 F.3d 179, 183 (5th Cir. 2000) (internal citation omitted) (quoting *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex. 1994), then citing *Morrison v. Chan*, 699 S.W.2d 205, 208 (Tex. 1985)).

[14] *Wagner v. State*, 539 S.W.3d 298, 306 (Tex. Crim. App. 2018).

[15] *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019) (footnotes omitted).

[16] *State v. Vasilas*, 187 S.W.3d 486, 492 (Tex. Crim. App. 2006).

an authentic 'governmental record.'"[17]    To sustain a conviction under § 37.10(a)(1), the document at issue must be a government record at the time the false entry is made—unlike, for instance, § 37.10(a)(2), which criminalizes the creation of a fake document with intent that it be taken as a genuine government record.[18]

The statute defines "government record" in relevant part as "anything belonging to, received by, or kept by government for information" or "anything required by law to be kept by others for information of government."[19]  Different lines of Texas precedent govern the disjunctive "belonging to" or "received by" elements of the definition.  In *Constructors Unlimited Inc. v. State*[20]—addressing a document "received by" the government for information—a contractor made false entries on "contractor's estimates" that were later submitted to the government.[21] Because the estimates "did not belong to the government; had not been received by the government; and were not kept by the government for information"[22] at the time the false entries were made, they were not government records and thus could not support liability under § 37.10(a)(1).[23]  Nor does it violate § 37.10(a)(1) to make a fake Social Security card.  A genuine Social Security card, having been issued by the

---

[17] *Neuwirth v. State*, No. 09-18-00248-CR, 2019 WL 3937997, at *4 (Tex. App.—Beaumont Aug. 21, 2019, no pet.) (mem. op., not designated for publication).

[18] *See* Tex. Penal Code § 37.10(a)(2).

[19] *Id.* § 37.01(2)(A)-(B).

[20] 717 S.W.2d 169 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd).

[21] *Id.* at 170-72.

[22] *Id.* at 172.

[23] *See id.* at 174.

government, is a government record; a fake Social Security card created on a defendant's computer is not.[24]

A different line of cases governs "government records" created by government employees in the course of their duties. These are records "belonging to" the government. In *Fernandez v. State*,[25] Sheriff's Deputy Fernandez made a false entry in a jail incident report that he created in the course of his duties.[26] Convicted of violating § 37.10(a)(1), he argued—in line with *Constructors*—that his false entry was made prior to the incident report becoming a "government record."[27] A Texas intermediate appellate court disagreed, reasoning that the cases that "fall under the 'received by' portion of [§] 37.01 . . . are inapposite here, because Fernandez was a county-employed deputy."[28] "Fernandez was acting in his official capacity as a detention officer when he completed the report about his altercation with Ramos, and the purpose of the report was to keep accurate and credible records at the detention center. Therefore, the report was an official government record."[29]

In *Hernandez v. State*,[30] a police officer drafted and saved onto his work computer an incident report that incorporated false statements.[31] It was

---

[24] *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 247 (Tex. Crim. App. 2019).

[25] 619 S.W.3d 779 (Tex. App.—San Antonio 2020, pet. ref'd).

[26] *Id.* at 781.

[27] *See id.* at 782.

[28] *Id.*

[29] *Id.*

[30] 577 S.W.3d 361 (Tex. App.—Houston [14th Dist.] 2019, pet ref'd).

[31] *Id.* at 364-65.

marked "DRAFT" at the top of each page.[32]  While the officer did not submit the document for review, the act of saving the draft onto his work computer's network made it available to others at the department.[33]  He was convicted under § 37.10(a)(1), and a Texas intermediate appellate court affirmed: "[T]he Offense Report bore the indicia that appellant had written the report on the precinct's computer system, property which the jury reasonably could have inferred belonged to and was kept by appellant's government employer for information."[34]

From *Fernandez*, we learn that "[a] governmental record *can* include an officer's report or a judge's warrant, starting at its inception if it is made at work for an official purpose."[35]  From *Hernandez*, we learn that a draft document can be a government record.[36]  However, neither *Fernandez* nor *Hernandez* clearly addresses the issue in this case: whether *copies* of government records are themselves always government records.  *Some* copies could be government records within the meaning of § 37.10(a)(1).  If a copy "belong[s] to, [is] received by, or kept by government for information"[37] or is "required by law to be kept by others for information of government,"[38] then that copy is a government record.  If a statute required that a permit be filed in triplicate, the original with the game warden, one copy with the city police, and one copy with the sheriff, a defendant could not appeal to the

---

[32] *See Hernandez v. State*, 614 S.W.3d 760, 760 (Tex. Crim. App. 2019) (SLAUGHTER, J., dissenting).

[33] *Hernandez*, 577 S.W.3d at 364.

[34] *Id.* at 368.

[35] *Fernandez*, 619 S.W.3d at 781 (emphasis added) (citations omitted).

[36] *Hernandez*, 577 S.W.3d at 367-68.

[37] TEX. PENAL CODE § 37.01(2)(A).

[38] *Id.* § 37.01(2)(B).

happenstance that his false entry on the version filed with the sheriff was made on a copy of the original filed with the game warden to avoid conviction under § 37.10(a)(1).

However, not *every* copy of a government record is itself a government record within the meaning of § 37.10(a)(1). To be a government record, a document must (in relevant part) "belong to, [be] received by, or kept by government *for information*."[39] Examples of such documents belonging to, received by, or kept by government for information are legion: vouchers and receipts accounting for jail commissary funds,[40] the pre-suit notice required by the Texas Tort Claims Act,[41] or a correctional officer's incident report.[42] But not every document that emerges from a government employee's printer is so sanctified. The weight of out-of-state authority agrees.[43]

---

[39] *Id.* § 37.01(2)(A) (emphasis added).

[40] *Mills v. State*, 941 S.W.2d 204, 208 (Tex. App.—Corpus Christi-Edinburg 1996, writ ref'd).

[41] *Fox v. State*, 418 S.W.3d 365, 371 (Tex. App.—Texarkana 2013, no pet.) ("[T]his record was indeed received by the government for information. The City was statutorily entitled to the information in the notice so that it could investigate the claim, settle the matter, or prepare for trial, among other things.").

[42] *Fernandez v. State*, 619 S.W.3d 779, 781-82 (Tex. App.—San Antonio 2020, pet. ref'd).

[43] *See State v. Brantner*, 758 A.2d 84, 95 (Md. 2000) ("Given the legislative history of the statute, as well as the reasoning behind similar statutes, it is thus clear that the purpose of the § 45A(a)(1) is protection of those public records in official custody, and not the protection of personal, officially generated copies of public records."); *accord United States v. Isler*, 36 M.J. 1061, 1064 (A.F.C.M.R. 1993) ("To hold every personal copy of one's [Permanent Change of Station] orders is a public record would, in effect, make every airman an official custodian of those copies, for we believe that is the only means for imposing individual criminality for not protecting one's personal copies as a public record."); *cf. State v. Shows*, 508 So. 2d 991, 994-95 (La. Ct. App.) ("While this statute definitely imposes a duty of maintaining books and records, neither it nor any other statute in the chapter prescribes the formal filing or depositing of checks or their duplicates. This requirement is crucial. Other cases in which convictions have been affirmed involved the

No. 25-10196

The Texas courts, however, have not conclusively resolved this issue. The Texas Court of Criminal Appeals declined to review *Hernandez*.[44] Justice Slaughter dissented, expressing concern that "the court of appeals' decision appears to create a *per se* rule that all electronic documents created by government employees and stored on government computers constitute 'governmental records' . . . regardless of whether such documents are shown to be 'belonging to, received by, or kept by [the] government for information.'"[45] That reasoning is persuasive, and we quote it at length:

> Appellant's conduct in entering information into a government database and hitting 'save' is the kind of action engaged in thousands, or perhaps tens of thousands, of times per day by government employees across the state. I disagree with the court of appeals' suggestion that all such actions necessarily result in the creation of a governmental record that may be tampered with, regardless of the type of document or information at issue. . . . Surely not every email, memo, report, etc., generated by a government employee constitutes a governmental record that is kept by the government for information. To hold otherwise would broadly permit criminal sanctions against government employees, even for *de minimis* falsifications on documents that are lacking in any official purpose. I can also see this being abused for selective or political prosecutions. . . . I would grant review in this case to clarify that not every document generated by a government employee on his government computer automatically constitutes a governmental record for purposes of the tampering statute. Rather, the State is bound to put forth

---

mutilation or falsifying of records whose filing or depositing had been clearly and specifically authorized by law."), *writ denied*, 512 So. 2d 464 (La. 1987).

[44] 614 S.W.3d 760 (Tex. Crim. App. 2019).

[45] *Id.* at 760-61 (Slaughter, J., dissenting) (quoting Tex. Penal Code § 37.01(2)(A)).

sufficient evidence to show that the document at issue is "belonging to, received by, or kept by" the government for some official informational purpose before it may constitute the type of document that would subject an actor to criminal liability for tampering. Because the Court declines to address these issues and refuses review, I respectfully dissent.[46]

Here, the City Secretary, a government employee, created and circulated a meeting agenda via email to the Mayor, City Administrator, City Attorney, and City Council Members around 5:20 p.m. on December 22. The circulated agenda contained a certification and the City Secretary's signature, indicating that the agenda was posted—or, at least, it was *to be posted*—at 6:00 p.m., some forty minutes later. We assume, without deciding, that she created and circulated this agenda pursuant to her official duties. Thompson received this email, added her proposed items to the attached agenda, then returned it to the City Secretary (blind-copying Papenfuss) with the instruction "Please see attached and post the updated agenda."

The document to which Thompson added items was not a "government record" within the meaning of § 37.10(a)(1), because it was not "belonging to, received by, or kept by government *for information*."[47] The courtesy copy of the agenda in Thompson's email inbox had no legal salience. It was of informational salience only to Thompson. The legal purpose of the *official* version of the agenda was to satisfy the requirements of the Texas Open Meetings Act: "A governmental body shall give written notice of the date, hour, place, and subject of each meeting held by the governmental

---

[46] *Id.* at 765-66 (SLAUGHTER, J., dissenting).

[47] TEX. PENAL CODE § 37.01(2)(A) (emphasis added).

No. 25-10196

body."[48]  "The notice of a meeting of a governmental body must be posted in a place readily accessible to the general public at all times for at least three business days before the scheduled date of the meeting . . . ."[49]  For a municipal government, that means posting it at city hall.  "A municipal governmental body shall post notice of each meeting on a physical or electronic bulletin board at a place convenient to the public in the city hall."[50] With narrow, enumerated exceptions, only the subject matter displayed on the required notice may be discussed at the meeting.[51]

To hold otherwise would make a misdemeanant out of many municipal employees.  If *any* copy of a document created by a government official for an official purpose is a "government record," then proofreading and marking suggested edits for one's colleague could be a crime.  We decline to construe the law to "make[] criminal activities which by modern standards are normally innocent."[52]  We need not decide whether the electronic document signed by the secretary was a government record or whether only the physically-posted notice was a government record within the meaning of § 37.10(a)(1), though we note that only the *posted* notice satisfied the requirement of the Texas Open Meetings Act.  However—assuming *arguendo* that the electronic document signed by the Secretary was a "government record"—the courtesy copy in Thompson's inbox was not. Thompson's edits to that document were to convey her directive to the

---

[48] Tex. Gov't Code § 551.041.

[49] *Id.* § 551.043(a).

[50] *Id.* § 551.050(b).

[51] *See id.* § 551.0415.

[52] *Papachristou v. City of Jacksonville*, 405 U.S. 156, 163 (1972).

Secretary to revise the agenda to reflect what Thompson thought should be added.  Those edits were not made on a "government record."

**2**

Having determined that the copy of the agenda that Thompson edited was not a government record, we turn to the elements of Thompson's *Franks* claim: "(1) the affiant, in support of the warrant, include[d] 'a false statement knowingly and intentionally, or with reckless disregard for the truth' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'"[53]  "At the pleading stage, '"mere allegations of 'taint'"' . . . may be adequate to survive a motion to dismiss where the complaint alleges other facts supporting the inference.'"[54]  "At the motion to dismiss stage, plaintiffs need only 'point out specifically the portion of the warrant affidavit that is claimed to be false . . . accompanied by a statement of supporting reasons.'"[55]  A court assessing a *Franks* claim performs a reconstructed affidavit analysis:  "[T]he essential inquiry is whether 'there remains sufficient content in the warrant affidavit to support a finding of probable

---

[53] *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

[54] *Wilson v. Stroman*, 33 F.4th 202, 212 (5th Cir. 2022) (alteration in original) (quoting *McLin v. Ard*, 866 F.3d 682, 690 (5th Cir. 2017)); *see McLin*, 866 F.3d at 690 ("[A]lthough our precedent demonstrates that mere allegations of taint are insufficient at summary judgment, such allegations may be adequate to survive a motion to dismiss where the complaint alleges other facts supporting the inference." (internal quotation marks omitted) (citation omitted)); *see also Terwilliger v. Reyna*, 4 F.4th 270, 283 (5th Cir. 2021) (noting distinction between burden of alleging a *Franks* violation to "withstand the test of *Iqbal/Twombly*" and ultimately proving *Franks* violation).

[55] *Hughes v. Garcia*, 100 F.4th 611, 620 (5th Cir. 2024) (alteration in original) (quoting *Terwilliger*, 4 F.4th at 283).

cause' *after* the 'material that is the subject of the alleged falsity or reckless disregard is set to one side.'"[56]

On appeal, Thompson identifies four portions of the warrant affidavit that she avers are false.  Of those, we conclude only three are germane.

First, paragraph 6 of the warrant affidavit states that the City Secretary asked Thompson whether she had edited the "*original* City Council Meeting Agenda" document: City Secretary "Hill related that she asked Mrs. Thompson if she had edited her original City Council Meeting Agenda document.  Mrs. Hill related that Mrs. Thompson advised Mrs. Hill yes, she had."

Second, paragraphs 4 and 5 contain allegations of forgery.  "In the document Mrs. Thompson provided [sic] had forged Mrs. Hills [sic] name on the document and added items to the agenda that she did not make."  "At 1745 hours Mrs. Thompson sent Mrs. Hill an email with the forged and changed agenda that she created."

Third, paragraph 10 of the affidavit states that "[d]ue to Mrs. Thompson doing the editing city council agenda [sic] the government document could have misinformed citizens/city council members of Godley."  It then enumerated several purposes of making and distributing city council agendas, including to "[m]emorialize compliance with the Texas Open Meeting act-legal compliance-and to allow for compliant or legal action if a violation of the Texas Open Meetings Act has occurred.  The agenda is the official source document put forth for public scrutiny of compliance."

We set these alleged misstatements to the side and ask whether what remains in the affidavit supports probable cause.  Viewing the existence of

---

[56] *Terwilliger*, 4 F.4th at 281-82 (quoting *Franks*, 438 U.S. at 171-72).

probable cause in the light most favorable to Thompson—as we must, at this stage[57]—we conclude that it does not. Probable cause is a "practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."[58] "[C]ourts must look to the 'totality of the circumstances' and decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer' demonstrate 'a probability or substantial chance of criminal activity.'"[59]

Each of the alleged misstatements supported the magistrate's apparent inference that the document at issue was a "government record." Thompson argues that Arbuthnot falsely inserted the word "original" in paragraph 6 of the affidavit, which asserted that Thompson told City Secretary Hill that Thompson edited the "*original* City Council Meeting Agenda document." She argues that the affidavit's assertions of forgery in paragraphs 4 and 5 were knowingly false, as were the assertions in paragraph 10 that the document was a "government document . . . the official source document . . . an official record."

Stripped of the objected-to misstatements, the affidavit fails to support a probable cause determination. That is because a violation of § 37.10(a)(1) requires a knowing false entry in a "government record" and where—as here—the document was not a government record, the elements of § 37.10(a)(1) are not satisfied. Remove Thompson's apparent confession to editing the "original" meeting agenda, the references to "forgery," and the various assertions that what was at issue was a "government document"

---

[57] *Id.* at 283.

[58] *Id.* at 282 (quoting *Maryland v. Pringle*, 540 U.S. 366, 370 (2003)).

[59] *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 56-57 (2018)).

or an "official record," and the affidavit describes utterly innocuous conduct: the drafting of a meeting agenda by individuals with differing views of what should be included. Thompson has adequately pleaded her *Franks* claim to survive a motion to dismiss.

As noted above, *Franks* liability must be assessed on a defendant-by-defendant basis. Officer Arbuthnot could be subject to *Franks* liability because he signed the warrant affidavit and swore to the validity of the facts included in it.[60] The Second Amended Complaint alleges that "Templer, as an investigator in the Agenda investigation[,] . . . wrote a lengthy report submitted to the prosecution detailing the facts and circumstances within the Department's possession. Templer wrote this report with knowledge that material facts on which he relied were fabricated and other material facts were omitted." At the motion to dismiss stage, Thompson is entitled to the benefit of the inference that Templer's report was prepared for the purpose of an eventual warrant application.[61] Therefore, Thompson has adequately pleaded that Templer may fall within the scope of *Franks* liability.

At oral argument, Thompson conceded that McGehee and Cantrell were outside the scope of *Franks* liability. Accordingly, we affirm the dismissal of the individual-capacity *Franks* claims against them.

**B**

We next assess Thompson's First Amendment retaliatory arrest claims. To prevail on her retaliatory arrest claims against the Individual

---

[60] *See id.* at 283.

[61] *See Hughes v. Garcia*, 100 F.4th 611, 622 (5th Cir. 2024) ("Few's deep involvement with the case raises a plausible inference that he knew the incident report would be used to prosecute Hughes . . . . That Few completed the incident report while Garcia completed the warrant affidavit does not absolve Few of liability given these strong indications that he knew exactly what purpose the incident report would serve.").

Defendants, Thompson must plead that she engaged in constitutionally protected speech, that defendants' retaliatory conduct adversely affected that protected speech, and that a causal connection exists between the defendants' retaliatory conduct and the adverse effect on her speech.[62] In the context of retaliatory *arrest* cases, the third element—the causal connection—is met by pleading the absence of probable cause.[63]

Because the district court concluded that Thompson had not adequately pleaded the absence of probable cause, it assessed her retaliatory arrest claim under the rule of *Nieves v. Bartlett*.[64] The *Nieves* exception allows a plaintiff to proceed with a retaliatory arrest claim if she adduces objective evidence that officers faced with her conduct generally exercise their discretion not to make an arrest, even when they have probable cause to do so.[65]

However, we have concluded that Thompson has adequately pleaded the absence of probable cause for her arrest. Therefore, we assess her First Amendment retaliation claims under the test set forth in *Mt. Healthy City School District Board of Education v. Doyle*.[66] "[I]f the plaintiff establishes the absence of probable cause, 'then the *Mt. Healthy* test governs.'"[67] Under

---

[62] *Nieves v. Bartlett*, 587 U.S. 391, 398-99 (2019).

[63] *Id.* at 401.

[64] 587 U.S. 391 (2019).

[65] *Id.* at 406 ("Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so."); *id.* at 407 ("[W]e conclude that the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.").

[66] 429 U.S. 274 (1977).

[67] *Nieves*, 587 U.S. at 404 (quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 97 (2018)).

that test, "[t]he plaintiff must show that the retaliation was a substantial or motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation."[68]  "[P]arties operating within the *Mt. Healthy* framework may present a wide range of evidence—both objective and subjective."[69]

Thompson has plausibly alleged that each individual defendant had a retaliatory animus, and that retaliation for protected speech was a substantial or motivating factor behind her arrest.  Specifically, she alleged that each individual defendant was aware of specific instances of Thompson's disfavored speech; that Templer executed the arrest to "punish [Thompson] for her speech and to chill her speech" and to "cement[] protection, loyalty, and praise from his supervisors"; that Cantrell and Arbuthnot "directed Templer to immediately arrest [her] . . . *before* the city council meeting to facilitate [her] absence from the meeting";  and that Mayor McGehee "agreed that the arrest should be executed in such a way that [Thompson] would be sitting in jail during the city council meeting and would be unable to advocate or cast her votes."  Her First Amendment retaliatory arrest claims against the individual defendants survive the motion to dismiss.

## III

Because Thompson has adequately pleaded underlying First and Fourth Amendment violations, we next determine whether her claim against

---

[68] *Id.* (first alteration not in original) (quoting *Lozman*, 585 U.S. at 97).

[69] *Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (ALITO, J., concurring).

No. 25-10196

the City satisfies the stringent requirements of *Monell v. Department of Social Services of City of New York*.[70]

Thompson's § 1983 claim against the City must satisfy the requirements of *Monell* and its progeny, under which municipal liability attaches only for "action[s] for which the municipality is actually responsible."[71] This is not *respondeat superior* liability.[72] Instead, the municipality incurs liability only when the action at issue is one of "an authorized policymaker or of an employee following the policymaker's lead."[73] A *Monell* claim consists of three elements: "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."[74] In other words, "[m]unicipal liability requires deliberate action attributable to the municipality that is the direct cause of the alleged constitutional violation."[75]

To survive a motion to dismiss on her *Monell* claims against the City, Thompson "need only allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable."[76] "To proceed beyond the pleading stage, a complaint's 'description

---

[70] 436 U.S. 658 (1978).

[71] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

[72] *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010) ("The elements of the *Monell* test exist to prevent a collapse of the municipal liability inquiry into a *respondeat superior* analysis.").

[73] *Burge v. Parrish of St. Tammany*, 187 F.3d 452, 471 (5th Cir. 1999) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 417 (1997) (SOUTER, J., dissenting)).

[74] *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell*, 436 U.S. at 694).

[75] *Zarnow*, 614 F.3d at 167.

[76] *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016).

23

of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts.'"[77]  A policy may take the form of a policy statement formally announced by an official policymaker,[78] or the plaintiff may "demonstrate a 'persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'"[79]

Because the identity of the policymaker is a question of state law, Thompson *may*—but need not—specifically identify the policymaker in her complaint.[80]  "[T]he question we face today is whether [Thompson] has pled facts that, read in the light most favorable to [Thompson], show that the statutorily authorized policymaker promulgated an unconstitutional policy."[81]

## A

Thompson asserts both a First Amendment claim and a retaliatory arrest First Amendment claim against the City.  In her Second Amended Complaint, Thompson alleged the existence of a "custom and practice of using the [Police] Department to target persons who were engaging in speech with which City officials disagreed."  She alleged that the "blue folder"

---

[77] *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) (alteration in original) (quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)).

[78] *Zarnow*, 614 F.3d at 168.

[79] *Id.* at 169 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).

[80] *Groden*, 826 F.3d at 285 & n.6.

[81] *See id.* at 285.

compiled by former Chief Jordan and distributed to the City Council "confirmed that prior reports made to City Council . . . about the Department retaliating against [citizens] because of their speech were true. . . . Jordan wrote that he was 'instructed to target city council persons for code violations in an effort to disparage them.'" She alleged that Jordan reported that "he himself was threatened with termination . . . if he did not recant a statement he recently made during a city council meeting." Thompson alleged that she was told by the City police "to stop publicly voicing her concerns. They said that if she did not, there would be consequences, which implied the Department would retaliate." She alleged the initiation of "sham investigations . . . into innocent conduct by Jordan and Papenfuss." She alleged that the City failed to act "because the Mayor and his allies were themselves utilizing the unconstitutional City custom to target and retaliate against Plaintiff for engaging in speech with which they disagreed."

Unlike *Peña v. City of Rio Grande City*,[82] where the only "specific fact" the plaintiff pleaded was the single incident in which he himself was involved,[83] Thompson has alleged specific instances of retaliation by the Godley Police against other citizens and city council members. She has alleged that the City's policy of retaliation was the "moving force" behind her arrest. She has alleged that city policymakers were on notice of the practice, both because she herself notified the Mayor and City Attorney and because then Chief Jordan had attested to it at a meeting at which the Mayor,

---

[82] 879 F.3d 613 (5th Cir. 2018).

[83] *See id.* at 622 ("But plausibly to plead a practice 'so persistent and widespread as practically to have the force of law,' a plaintiff must do more than describe the incident that gave rise to his injury.") (internal citation omitted) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011))).

City Attorney, and City Administrator were present. Thus, Thompson "has pled facts that, read in the light most favorable to [her], show that the statutorily authorized policymaker promulgated an unconstitutional policy."[84]

"A policymaker is 'one who takes the place of the governing body in a designated area of city administration.' He or she must 'decide the goals for a particular city function and devise the means of achieving those goals.'"[85] "A city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) 'it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role.'"[86]

We need not—and do not—decide today *which* statutorily-authorized policymaker promulgated or ratified the alleged unconstitutional policy. In Texas, the board of aldermen is the governing body[87] and thus the ultimate policymaker of a Type A municipality like Godley. Thompson has pleaded that Mayor McGehee and interim Police Chief Cantrell are also *Monell* policymakers, and that Mayor McGehee's single decision to punish her for her speech, and Interim Police Chief Cantrell's continuation of the Godley Police's "persistent custom of retaliation for speech," constitute *Monell* policies.[88] The factual record at this stage is insufficiently developed to determine whether the board of aldermen functionally delegated

---

[84] *Groden*, 826 F.3d at 285.

[85] *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010) (internal citation omitted) (first quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc), then quoting *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984) (en banc)).

[86] *Id.* (quoting *Bennett*, 728 F.2d at 769).

[87] *See* TEX. LOC. GOV'T CODE § 22.031(b).

[88] *See Groden*, 826 F.3d at 286.

policymaking authority to either the Mayor or interim Police Chief; we do not decide that question.

**B**

Thompson's pleadings assert an unconstitutional policy of municipal retaliation for disfavored speech. She alleges that the unconstitutional policy resulted in her arrest without probable cause (a Fourth Amendment violation) and her retaliatory arrest (a First Amendment violation).

> To satisfy [*Monell*'s] cause in fact requirement, a plaintiff must allege that "the custom or policy served as the moving force behind the [constitutional] violation" at issue, or that her injuries resulted from the execution of the official policy or custom. The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts.[89]

Thompson's complaint contains the requisite specific facts. The causal relationship between the City's policy of retaliation for disfavored speech and Thompson's arrest for disfavored speech is straightforward. Her First Amendment, First Amendment retaliatory arrest, and Fourth/Fourteenth Amendment *Monell* claims against the City may proceed.

**IV**

We turn next to Thompson's abuse of process claim. In her Second Amended Complaint, she characterized the claim as a "Fourteenth Amendment Violation – Abuse of Process" and enumerated the elements of

---

[89] *Spiller v. City of Texas City, Police Dept.*, 130 F.3d 162, 167 (5th Cir. 1997) (internal citation omitted) (first quoting *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 533 (5th Cir. 1996), then citing *Fraire v. Arlington*, 957 F.2d 1268, 1277 (5th Cir. 1992)).

the Texas state law tort of abuse of process. She asserted that the abuse of process deprived her of her right to liberty and her First Amendment right.

There is no constitutional right to be free from abuse of process *as such*.[90] However, the "facts that constitute the state tort of abuse of process can also constitute an unreasonable search, unreasonable seizure, or violation of another right 'locatable in constitutional text.'"[91] One such right "locatable in constitutional text" is the right to be free from fabrication of evidence. The Fifth Circuit has "recognized a freestanding 'due process right not to have [officials] deliberately fabricate evidence and use it to frame and bring false charges against a person.'"[92] This is the theory that Thompson advanced in her reply to the motion to dismiss in the district court and in her briefing before this court.[93]

The district court's order did not discuss this claim. We decline to address it in the first instance, either as it may apply to Individual Defendants

---

[90] *Morgan v. Chapman*, 969 F.3d 238, 247 (5th Cir. 2020), *overruled on other grounds as recognized by Espinal v. City of Houston*, 96 F.4th 741, 748 (5th Cir. 2024).

[91] *Id.* (internal quotation omitted) (quoting *Castellano v. Fragozo*, 352 F.3d 939, 954 (2003)).

[92] *Dean v. Phatak*, 162 F.4th 555, 565 (5th Cir. 2025) (internal quotation omitted) (quoting *Cole v. Carson*, 802 F.3d 752, 771 (5th Cir. 2015), *cert. granted, judgment vacated sub nom., Hunter v. Cole*, 580 U.S. 994 (2016), *and opinion reinstated in part*, 935 F.3d 444 (5th Cir. 2019) (en banc)).

[93] *See Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) ("Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.").

No. 25-10196

or to the City.  We remand to the district court to consider whether Thompson has adequately pleaded a fabrication claim.

## V

Thompson asserted malicious prosecution claims against all defendants in the district court.  She has not meaningfully briefed these claims on appeal; we find that they are forfeited.[94]

## VI

Thompson also argues that the district court erred by invoking *Carswell v. Camp*[95] to prevent discovery against the City.  Because no live discovery dispute remains, we decline to reach the issue.

\* \* \*

We REVERSE the dismissal of Thompson's First, Fourth, and Fourteenth Amendment claims against Jeremy Arbuthnot and Spencer Templer; First Amendment retaliatory arrest claims against Individual Defendants; *Monell* claims against the City; and abuse of process claim—which we construe as a fabrication claim—against all defendants.  Those claims are REMANDED for further proceedings.  We AFFIRM the dismissal of her Fourth and Fourteenth Amendment claims against former Mayor Acy McGehee and former interim Police Chief Matthew Cantrell.

---

[94] *See Monteon-Camargo v. Barr*, 918 F.3d 423, 428 (5th Cir. 2019)

[95] 54 F.4th 307 (5th Cir. 2022).